**Affirmed as Modified and Memorandum Opinion filed March 14, 2023.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-22-00723-CV

---

## IN THE INTEREST OF J.S., A/K/A J.T.S., H.S., A/K/A H.L.S., JR., J.S., A/K/A J.D.S., A.S., A/K/A A.J.S., CHILDREN

---

**On Appeal from the 312th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2014-33793**

---

## MEMORANDUM OPINION

Appellants T.T.R. (Mother) and H.L.S. (Father) appeal the trial court's final decree terminating their parental rights and appointing the Department of Family and Protective Services as sole managing conservator of their children J.S. aka J.T.S. (Julian), J.S. aka J.D.S. (Jenna), H.S. aka H.L.S., Jr. (Hal), and A.S. aka A.J.S., (Alanis).[1] The trial court terminated Mother's parental rights on predicate grounds

---

[1] Julian, Jenna, Hal, and Alanis are pseudonyms. Pursuant to Texas Rule of Appellate Procedure 9.8, we use fictitious names to identify the minors and other individuals involved in this case.

of endangerment, constructive abandonment, and failure to comply with a family service plan. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (N) and (O). The trial court terminated Father's rights on predicate grounds of endangerment, failure to financially support the children, and constructive abandonment. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (F), and (N). The trial court further found that termination of both parents' rights was in the children's best interest. *See* Tex. Fam. Code § 161.001(b)(2). In four issues on appeal Mother challenges the legal and factual sufficiency of the evidence to support the endangerment findings, termination on grounds of constructive abandonment before all appeals were exhausted, and the ambiguity of the family service plan. Father, also asserting four issues, challenges the legal and factual sufficiency of the evidence to support the predicate grounds for termination. Neither parent challenges the trial court's finding that termination of their parental rights is in the children's best interest.

## BACKGROUND

### I.      Pretrial Proceedings

#### A.      Original Petition for Termination

This case began in 2014 when the Department filed an original petition for protection of the children. At the time the petition was filed Julian was nine years old, Jenna was seven, Hal was six, and Alanis was three. Family service plans were created for each parent and caseworkers reviewed the plans with the parents. The Department became involved in the family's lives due to a report to law enforcement on April 1, 2014. Mother was seen driving a pickup truck with several men while the children were unrestrained in the bed of the truck. After returning home from going out to buy more beer, Mother was so intoxicated she was unable to walk straight. After they returned a fight broke out and one of the men tried to hit Mother. The children "were all running around as they usually do." The report noted that

2

every day when the children returned from school, they were unable to get into their home until Mother arrived between 6:00 and 7:00 p.m. The children, unable to get into their home, were in danger of being injured by traffic and were seen injuring local pets. It was also reported that Mother had been seen obtaining drugs from someone in the apartment complex. It was reported that the children "appear pretty skinny" and it appeared the children's basic needs were not being met.

Approximately 18 months later, on December 10, 2015, the trial court signed an agreed decree in which the court appointed the Department sole managing conservator of the children but did not terminate the parents' rights. Both parents were appointed possessory conservators of the children and were permitted supervised visitation with the children after testing negative for illegal drugs. Both parents were ordered to pay monthly child support to the Department.

At a visit with the children on January 7, 2016, Mother "became combative . . . , cursing at the caseworker, telling the children they were returning home and then threw a book at [Father]." Both parents' visits with the children were suspended after this incident. The trial court continued to hold bi-annual status hearings at which both the caseworker and the Child Advocate would submit reports. According to the Child Advocate's report Mother tested positive for cocaine on May 20, 2016, June 20, 2016, July 19, 2016, August 11, 2016, September 13, 2016, October 24, 2016, October 27, 2016, June 15, 2017, and January 31, 2019. Father tested positive for marijuana on May 18, 2016, and June 17, 2016. Father tested negative for drugs on April 26, 2017, and October 27, 2016, and positive for alcohol on November 3, 2016.

The children had been participating in family therapy with Father until January 25, 2018, when it was discovered that Father had an open warrant for assault of a family member. At that time reunification with Father was not pursued. Father

was subsequently arrested on the warrant, convicted, and sentenced to two years' confinement in the Institutional Division of the Texas Department of Criminal Justice.

During the time following appointment of the Department as sole managing conservator the children were in foster homes that were meeting the children's physical and emotional needs.

## B.    Motion to Modify

On March 26, 2019, the Department filed a motion to modify the parent-child relationship and to terminate both parents' rights to the four children. At that time the children were ages 14, 12, 10, and 8. The Department alleged that the circumstances of the children, a conservator, or other party affected by the order had materially and substantially changed since rendition of the order. The Department sought termination of Mother's parental rights on grounds of endangerment, failure to support, constructive abandonment, and failure to follow a family service plan. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (F), (N), and (O). The Department sought termination of Father's parental rights on the same grounds.

The trial court continued to hold regular status hearings with detailed reports from the caseworker and the Child Advocate. In June 2021 Father was released from prison and returned to Houston. Father went to Julian's foster home, removed him from the foster home, and took him to Father's home. Julian communicated with the Child Advocate and assured the Child Advocate he was safe, but refused to give the address of Father's home. On September 2, 2021, the trial court signed an order in which it ordered both parents to comply with their family service plans. The trial court further found that Julian was not placed with a relative or other designated caregiver because he, at the age of 16, left foster care. The trial court further ordered that there should be no visitation between the three younger children and either

4

parent, and that the parents could not use the older children to contact the younger children. The trial court continued regular status hearings until the final hearing began April 27, 2022.

## II. Final Hearing

Jamesha Cherry, the Department caseworker at the time of the final hearing, testified that she had been assigned to the case since August 2020. At the time of the final hearing the children were ages 16, 15, 13, and 11. The children initially came into the care of the Department in April 2014 "due to being able to roam freely while their mother was intoxicated." At the time of the final hearing Julian, the oldest child, was living with Father and the three younger children were living with their paternal aunt and uncle who were willing to adopt the children.

At the time the children came into the Department's care they lived in a home with no water or gas. The children had to find food on their own, which "led them to digging in garbage cans." The children's clothes "had a stench to them," and there were "roaches and rats in the home." The Department told Father the conditions the children were living in, and Cherry testified that, to her knowledge, Father did nothing to mitigate their environment.

The Department did not believe Mother could provide a safe, stable environment for the children due to Mother's alcohol and substance abuse. The Department was named sole managing conservator of the children in 2015 and the parents were named possessory conservators. The parents were ordered to provide monthly child support and were permitted visitation with the children upon a negative drug test.

After the Department was appointed sole managing conservator the children were placed in foster homes that met their physical, emotional, and educational

5

needs. The children were eventually placed with their paternal aunt and uncle who made sure the children were well fed and lived in a neat and clean environment free of odors and rodents.

The Department developed a family service plan reasonably tailored to address Mother's issues and aid in reunification with her children. The service plan requested Mother to:

- Complete a substance abuse assessment and follow all recommendations;
- Complete a psychosocial evaluation and follow all recommendations;
- Complete a domestic violence assessment and follow all recommendations, if needed;
- Provide proof of housing and income;
- Refrain from criminal activities;
- Participate in twelve-step meetings; and
- Remain in contact with the caseworker.

The request for a domestic violence assessment was made because Mother had engaged in an altercation with Father during supervised visitation with the children. Mother completed a substance abuse assessment, psychosocial assessment, domestic violence assessment, parenting classes, and a battering intervention program. It was recommended that Mother attend individual and group therapy for substance abuse, but Mother refused to participate and was placed on "inactive status" with the treatment facility "due to disrespecting the people that try to get her set up with services[.]"

The Department further requested that Mother submit to weekly drug testing, but Mother failed to submit to testing each time she was asked. It was explained to Mother that a missed drug test would be considered a positive result. On March 30,

6

approximately one month before the final hearing, Mother submitted to a urinalysis but refused to submit to a hair follicle test. The reason Mother gave for refusing to submit to the hair follicle test was that those tests "keep coming back positive, and that's not true." Mother denied any drug use at all.

At the time of the final hearing Mother was not allowed visitation with the children because of the altercation that occurred between Mother and Father while the parents were visiting the children.

With regard to Father, Cherry testified that Father was aware of the Department's involvement when the children initially came into care. Father made no efforts at that time to "mitigate the children's situation." The Department's biggest concern about Father was his conviction and two-year imprisonment for assault of a family member. Father did not take responsibility for his crime but asserted that his accuser had lied. Father was released from prison in June 2020 and lived in a halfway house until October 2020. From October 2020 through August 2021 Father took no action to maintain contact with his children.

The Department developed a family service plan with which Father complied. The Department, however, was unable to consider Father for placement of the children because Father had allowed Julian to live with him although Julian was supposed to be living with his aunt and uncle at the time. Father was not meeting Julian's medical needs at the time Julian lived with him. Julian was also not attending school.

As to child support Cherry testified that Mother had been ordered to pay $100 per month and Father had been ordered to pay $200. Neither parent paid any support to the children's caregivers.

On April 25, the Monday before the final hearing, Cherry visited Father's

home and found that Mother was also there. Cherry testified that Father's home was not an appropriate placement for the children due to "trash that is surrounding the residence, the people that are hanging outside the – all of the loose animals, the dogs over there." Cherry testified that the individuals loitering outside Father's home made her feel unsafe. Cherry was unable to inspect the inside of the home because Mother refused entry.

Cherry testified that since she had been appointed to the case neither parent had shown the ability to provide for the children's physical and emotional needs. If the children were returned to their parents Cherry was concerned that they would not have their medical needs met and would not be enrolled in school.

Cherry further testified that Julian was not enrolled in school and did not want to attend school. The Child Advocate had helped Julian start the process of enrolling in a GED program. Julian wanted to work but was unable to obtain employment because he did not have a copy of his birth certificate with which to obtain a state identification card. Julian asked his parents to help him obtain his birth certificate, but they had not done so.

The three youngest children had been living with their paternal aunt and uncle since June 2020. The paternal aunt (Aunt) testified that neither parent demonstrated an ability to care for the children's physical and emotional needs. Aunt testified that if the children were returned to their parents, they would most likely suffer emotional breakdowns. When the children first came to Aunt they had behavior issues and difficulty communicating and expressing themselves.

Hal, 13 years old at the time of the final hearing, testified that his desire was to remain with his aunt and uncle. Hal could not remember the last time he had any contact with his parents. Jenna, 15 years old at the time of the final hearing, testified that she wished to be adopted by her aunt and uncle because she felt loved in their

home and was able to stay with her siblings. When asked whether she would like to maintain contact with her parents in the future Jenna responded that she would not.

David Begley, the Child Advocate for the three youngest children, testified that he came into the case approximately six months before the final hearing. Begley noticed the children were bonded with their aunt and uncle, were involved in extracurricular activities, and had improved their grades in school. Begley testified that it would be "emotionally devastating" if the children were removed from their aunt and uncle. Begley testified that Jenna was working on a school assignment that prompted her to answer what one thing she would change if she could change anything. Jenna responded that "she would change her parentage because then she wouldn't know hunger or abandonment."

Carrie Hendricks-Helm, another Child Advocate assigned to all four children, had been on the case since February 2017. Hendricks-Helm testified to the positive changes in the children since moving in with their aunt and uncle. Alanis used to need special education at school, but since living with her aunt and uncle, her grades improved and she no longer needed extra help in school. Hendricks-Helm testified that she regularly met with the parents, especially with Mother. In her opinion, neither parent demonstrated an ability to care for the children's physical and emotional needs.

Hendricks-Helm testified that although Julian supposedly lived with Father, Julian actually stayed at a friend's house most of the time. Neither parent helped Julian obtain a copy of his birth certificate so he could apply for a GED program or a job. Julian lived with Father for several months, but Father did not make sure Julian was enrolled in school or that he received medical care.

After the Department rested, Father testified. Father testified that he made a dental appointment for Julian, but Julian backed out before seeing the dentist. Father

9

further testified that he did not help Julian enroll in school or obtain his birth certificate because he thought the Department was handling those tasks. Father testified that he was unable to support his children because his brother, the children's uncle and caregiver, refused to answer Father's phone calls. Later Father testified that he sent money to his children's caregivers upon his release from prison in June 2020. Father testified that he did not know Mother was at his home and she does not live with him. Father denied that it was his responsibility to ensure that Julian was enrolled in school or a GED program.

On cross-examination Father denied fighting with Mother in front of the children, which led to suspension of visitation with the children. When Father found out Julian was not attending school, he told Julian to contact the caseworker to see if she could help him enroll.

Mother began her testimony in the videoconference hearing after Father rested. Due to technical difficulties the trial court recessed the final hearing and resumed on May 18, 2022. The trial court determined that Mother's testimony via electronic means was not productive in that Mother interrupted other witnesses and her own attorney. The trial court determined that Mother's testimony should resume in person. Due to illness Mother did not appear in person on May 18, 2022. The trial court recessed and required Mother to appear in person to resume testimony on June 23, 2022.

The final hearing resumed at 10:00 a.m. on June 23, 2022. As of 11:28 a.m. Mother had not appeared. The trial court allowed Mother to appear and testify over the phone because Mother was not able to appear in person. Mother testified that the only one of her children she had spoken with since 2015 was Julian. When asked about completion of the family service plan Mother became argumentative and responded, "The Judge never acknowledged nothing I've done." The trial court gave

10

Mother's counsel an opportunity to speak with Mother and explain the need for her testimony. After allowing Mother's attorney to speak with her, Mother returned to the phone and stated, "I'm not going to let – keep sitting and listen to her dumb ass shit." At that time the trial court removed Mother from the hearing. Because Mother's counsel had no further witnesses he rested.

The Department sought to re-open its case in chief because Julian's circumstances had substantially changed since the beginning of the final hearing. Caseworker Cherry testified that Julian left Father's home, returned to his foster home, and did not intend to return to Father's home. The foster parents were ensuring that Julian received medical and dental care that he had needed. Cherry testified that it was not safe for Julian to return to Father's home. Father had not attempted to see Julian since Julian left Father's home. Julian's foster mother was enrolling him in a credit recovery program to allow Julian to catch up in school. The foster mother also assisted Julian in seeking employment.

The trial court conducted an in-chamber interview with Julian in which Julian told the court that he left the foster home in May 2021 and moved in with Father. Julian reported that he asked both his parents to help him obtain state-issued identification, but neither parent would help him. Julian dropped out of tenth grade in high school after moving in with Father. After dropping out of school Julian "linked up with people from a gang" to earn money. Julian said that Father knew he was spending time with gang members. Julian spent time at his cousin's house at which "there was always fights; you know, people drawing guns; stuff of that sort."

While Julian lived at Father's house, Mother would occasionally visit, and the parents would "get into altercations." Julian saw Father push Mother onto the floor, and on another occasion saw Father punch Mother, resulting in Mother's mouth bleeding. Julian testified that he witnessed his parents engage in domestic abuse

11

"around every weekend." Julian also described an instance in which Father threatened to harm his oldest daughter's boyfriend if the boyfriend did not give Father money.

When Julian confronted Father about the domestic abuse and the failure to help him obtain identification, Father told Julian, "he was tired of hearing it and that [Julian] should just go back with [his] foster mom." Julian told the court that the domestic abuse was affecting his mental health and caused him to consider harming himself. Julian testified that at the time the children originally came into care the domestic abuse between his parents was worse than what he witnessed while living with Father. When asked what he thought about the termination of his parents' rights, Julian said, "I'd love to see that happen" because his parents were not fit to care for him or his younger siblings.

Each of the three younger children spoke with the trial court in chambers. All of the children expressed a desire to remain with their aunt and uncle and not live with their parents. Alanis, who was 11 years old, told the trial court that she would be very upset if she were returned to either of her parents. Alanis explained that she did not "want to have anything to do with what [Mother]'s doing." Alanis also told the trial court that she would be upset if she were returned to Father. When asked why she would be upset Alanis responded that Father was "not a good person to be around," and would not "be there if [she] needed anything." In contrast Alanis said her aunt and uncle were "always there for me."

After the final hearing the trial court found that the circumstances of the Children Conservators, or other party affected by the prior order had materially and substantially changed since the rendition of the prior order and the appointment of the Department as sole managing conservator would be a positive improvement for the children. The trial court terminated both parents' parental rights on the predicate

grounds of endangerment and constructive abandonment. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), and (N). The trial court further found by clear and convincing evidence that Mother failed to comply with a family service plan and Father failed to support the children. *See* Tex. Fam. Code § 161.001(b)(1)(F) and (O). Further finding that termination would be in the best interest of the children, the trial court terminated both parents' rights and appointed the Department as sole managing conservator. Both parents filed timely appeals.

## ANALYSIS

In Mother's appeal she challenges the legal and factual sufficiency of the evidence to support the predicate grounds of endangerment. Mother further asserts that the trial court erred in finding constructive abandonment because the "parents had not exhausted all appeals." Finally, Mother asserts the trial court erred in finding that she failed to comply with the family service plan because the plan was ambiguous.

In Father's appeal he challenges the legal and factual sufficiency of the evidence to support the predicate grounds for termination. Neither parent challenges the trial court's finding that termination is in the best interest of the children.

## I.    Standards of Review

In a proceeding to terminate the parent-child relationship under Texas Family Code section 161.001, the petitioner, in this case the Department, must establish by clear and convincing evidence one or more acts or omissions enumerated under subsection (1) of section 161.001(b) and that termination is in the best interest of the child under subsection (2). Tex. Fam. Code § 161.001; *In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Involuntary termination of parental rights is a serious matter implicating fundamental

constitutional rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re S.R.*, 452 S.W.3d 351, 357 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Although parental rights are of constitutional magnitude, they are not absolute. *In re A.C.*, 560 S.W.3d 624, 629 (Tex. 2018).

Due to the severity and permanency of terminating the parental relationship, Texas requires clear and convincing evidence to support such an order. *See* Tex. Fam. Code § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 265-66 (Tex. 2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *In re J.F.C.*, 96 S.W.3d at 264. This heightened burden of proof results in a "correspondingly searching standard of appellate review." *In re A.C.*, 560 S.W.3d at 630; *see also In re C.M.C.*, 273 S.W.3d 862, 873 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

In reviewing legal sufficiency of the evidence in a parental termination case, we must consider all evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). We assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence that a reasonable fact finder could have disbelieved. *Id.*; *In re G.M.G.*, 444 S.W.3d 46, 52 (Tex. App.—Houston [14th Dist.] 2014, no pet.). However, this does not mean that we must disregard all evidence that does not support the finding. *In re J.B.*, No. 14-20-00766-CV, 2021 WL 1683942, at *4 (Tex. App.—Houston [14th Dist.] Apr. 29, 2021, pet. denied) (mem. op.). Because of the heightened standard, we also must be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id.*

In reviewing the factual sufficiency of the evidence under the clear-and-

convincing standard, we consider and weigh disputed evidence contrary to the finding against all the evidence favoring the finding. *In re A.C.*, 560 S.W.3d at 631; *In re J.O.A.*, 283 S.W.3d at 345. "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re J.O.A.*, 283 S.W.3d at 345. We give due deference to the fact finder's findings, and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

## II.    Predicate Grounds of Endangerment

### A.    Applicable law

Both parents challenge the legal and factual sufficiency of the trial court's findings of endangerment. *See* Tex. Fam. Code § 161.001(b)(1)(D) & (E). Both parents also challenge the remaining predicate grounds for termination.

To affirm a termination judgment on appeal, a court need uphold only one termination ground—in addition to upholding a challenged best-interest finding— even if the trial court based the termination on more than one ground. *In re N.G.*, 577 S.W.3d at 232; *In re L.M.*, 572 S.W.3d 823, 832 (Tex. App.—Houston [14th Dist.] 2019, no pet.). Further, due to the significant collateral consequences of terminating parental rights under section 161.001(b)(1)(D) or (E),[2] "[a]llowing section 161.001(b)(1)(D) or (E) findings to go unreviewed on appeal when the parent

---

[2] Section 161.001(b)(1)(M) provides that parental rights may be terminated if clear and convincing evidence supports a finding that the parent "had his or her parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E) or substantially equivalent provisions of the law of another state." Tex. Fam. Code § 161.001(b)(1)(M). Thus, when parental rights have been terminated for endangerment under either section 161.001(b)(1)(D) or (E), that ground becomes a basis to terminate that parent's rights to other children.

has presented the issue to the court thus violates the parent's due process and due course of law rights." *In re N.G.*, 577 S.W.3d at 237. Thus, when, as here, a parent challenges predicate termination grounds under subsection 161.001(b)(1)(D) or (E), we must address them and detail our analysis. *See id.*

A trial court may order termination of a parent-child relationship if the court finds by clear and convincing evidence that a parent has knowingly placed or knowingly allowed a child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child and/or engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E). Both subsections D and E require proof of endangerment. To "endanger" means to expose the child to loss or injury or to jeopardize the child's emotional or physical health. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

While both subsections D and E focus on endangerment, they differ regarding the source of the physical or emotional endangerment to the child. *See In re B.S.T.*, 977 S.W.2d 481, 484 (Tex. App.—Houston [14th Dist.] 1998, no pet.). Endangerment under subsection D may be established by evidence related to the child's environment. *In re A.S.*, 261 S.W.3d 76, 83 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). "Environment" refers to the acceptability of living conditions, as well as a parent's conduct in the home. *In re J.E.M.M.*, 532 S.W.3d 874, 881 (Tex. App.—Houston [14th Dist.] 2017, no pet.). A child is endangered when the environment creates a potential for danger that the parent is aware of but consciously disregards. *In re S.R.*, 452 S.W.3d at 360. Although the parent need not have certain knowledge that an actual injury is occurring, the parent must at least be aware of the potential for danger to the child in such an environment and must have disregarded

16

that risk. *In re J.D.*, 436 S.W.3d 105, 114 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

The fact finder may infer from past conduct endangering the child's well-being that similar conduct will recur if the child is returned to the parent. *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.); *see also In re F.H.*, No. 14-18-00209-CV, 2018 WL 3977931, at *8 (Tex. App.—Houston [14th Dist.] Aug. 16, 2018, no pet.) (mem. op.). Subsection D permits termination if the petitioner proves parental conduct caused a child to be placed or remain in an endangering environment. *In re J.W.*, 645 S.W.3d 726, 749 (Tex. 2022). Subsection D permits termination based upon only a single act or omission. *In re V.A.*, 598 S.W.3d 317, 329 (Tex. App.—Houston [14th Dist.] 2020, pet. denied).

Under subsection E, the cause of the endangerment must be the direct result of the parent's conduct, including acts, omissions, and failures to act, and the requirements of the subsection may be satisfied by showing the parent engaged in a course of conduct that endangered the child's physical or emotional well-being. *In re J.D.*, 436 S.W.3d at 114. The statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *Id*. While endangerment often involves physical endangerment, the statute does not require that conduct be directed at a child or that the child actually suffers injury; rather, the specific danger to the child's well-being may be inferred from parents' misconduct alone. *Boyd*, 727 S.W.2d at 533; *In re L.M.*, 572 S.W.3d at 834. A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re F.E.N.*, 542 S.W.3d 752, 764 (Tex. App.—Houston [14th Dist.] 2018, no pet.).

### B. Mother: endangerment by environment (161.001(b)(1)(D))

In Mother's first issue she asserts there is insufficient evidence to support the

trial court's finding that she knowingly placed or knowingly allowed the children to remain in conditions that endangered them because there is no evidence that Mother had control over placement of the children since the original removal by the Department resolved in 2015 with the Department's appointment as sole managing conservator. In this issue Mother challenges the sufficiency of the evidence to support the trial court's finding under subsection D. While Mother is correct that the Department was appointed sole managing conservator in 2015, the relevant time frame for evaluating a subsection D ground is before the children's removal. *In re J.W.*, 645 S.W.3d at 749.

The evidence as detailed above, is sufficient for the court to have found Mother engaged in acts or omissions pursuant to subsection D. The record reflects that the children were removed from Mother's care in April 2014 "due to being able to roam freely while their mother was intoxicated." The children were living with their maternal grandmother in a home with no water or gas. The children's clothes were dirty and were described as having "a stench to them." The home had roaches and rats and the children were digging in garbage cans for food.

Mother testified that she moved the children into her mother's home after she was asked to leave subsidized housing. Mother admitted the grandmother's home had no water and electricity and that she had to take the children elsewhere to bathe. "While poverty should not be a basis for termination of parental rights, a parent's inability to provide basic utilities in the family home may constitute evidence of endangerment of the children's well-being." *In re H.D.M.*, No. 09-18-00050-CV, 2018 WL 2974461, at *7 (Tex. App.—Beaumont June 14, 2018, pet. denied) (mem. op.). Mother did not contradict the caseworker's testimony that the children were roaming freely due to her intoxication or that they were digging in garbage cans for food prior to their removal.

18

Considered in the light most favorable to the trial court's finding, the evidence is legally sufficient to support the trial court's finding that termination of Mother's parental rights was justified under Family Code section 161.001(b)(1)(D). Further, in view of the entire record, we conclude the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that termination was warranted under section 161.001(b)(1)(D). Accordingly, we conclude the evidence is legally and factually sufficient to support the subsection D finding.

Having concluded the evidence is legally and factually sufficient to support the trial court's finding under subsection D, we need not review the sufficiency of the evidence to support the subsections E, N, and O findings. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). We overrule Mother's issues on appeal.

## C. Father: endangerment by conduct (161.001(b)(1)(E))

In Father's first and second issues he asserts the evidence is legally and factually insufficient to support termination of his parental rights on endangerment grounds. *See* Tex. Fam. Code § 161.001(b)(1)(D) & (E). We will address Father's second issue first, i.e., whether the evidence is legally and factually sufficient to support termination of Father's parental rights under subsection E.

A finding of endangerment under subsection E requires evidence that the endangerment was the result of the parent's conduct, including acts, omissions, or failures to act. *In re S.R.*, 452 S.W.3d at 360. A trial court properly may consider actions and inactions occurring both before and after a child's birth and before and after removal to establish a course of conduct. *Id.* at 360–61. A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re T.L.E.*, 579 S.W.3d 616, 624 (Tex. App.—Houston [14th Dist.] 2019, pet. denied).

"Domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment." *In re P.N.T.*, 580 S.W.3d 331, 356 (Tex. App.—Houston [14th Dist.] 2019, pet. denied) (quoting *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.)). Violence does not have to be directed toward the child or result in a final conviction. *In re V.V.*, 349 S.W.3d 548, 556 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) ("Texas courts routinely consider evidence of parent-on-parent physical abuse in termination cases without specifically requiring evidence that the conduct resulted in a criminal conviction.").

The record reflects that the parents' visitation with their children was suspended in early 2016 because Mother and Father engaged in an altercation in front of the children at a supervised visitation. The children could not be placed with Father because, in late 2018, he was convicted on a plea of guilty to assault of a family member. The indictment reflected a 2011 conviction for assault of a family member. Julian testified that he witnessed both parents engaging in domestic violence almost every weekend. Julian testified that at the time he and his siblings originally came into the Department's care the domestic violence between his parents was worse than it had been while he later lived with Father.

Father acknowledges "this evidence is certainly problematic" but asserts "it is important to remember that Julian was a teenager, not a child of tender years who was unable to take actions to protect himself." We decline to hold that a child's ability to protect himself from domestic violence can mitigate the endangering nature of such violence. Abusive and violent conduct can produce an environment that endangers the well-being of a child, and evidence that a person has engaged in abusive conduct in the past permits an inference that the person will continue such violent behavior in the future. *Walker v. Tex. Dep't of Family & Protective Servs.*,

20

312 S.W.3d 608, 617 (Tex. App.–Houston [1st Dist.] 2009, pet. denied).

Father further asserts that while "[t]here is some evidence of domestic violence taking place prior to [Department] involvement," Father's actions "from the distant past" without more cannot be sufficient to terminate parental rights. While termination may not be based solely on conditions that existed in the distant past but no longer exist, the dispositive inquiry is whether the past continues to bear on the present. *In re T.L.E.*, 579 S.W.3d at 625. The record reflects that the domestic violence in which Father engaged was not in the distant past and continued to exist. Julian's testimony shows that Father continued to engage in domestic violence almost every weekend. Father was also convicted of domestic violence while this case was pending.

Father further asserts that there "is no evidence of any endangering course of conduct on Father's part between 2014 and May 2021." Father contends that during this time period the children did not live with him so he could not have endangered them. Father ignores evidence of his altercation with Mother at a supervised visitation and his conviction for assault of a family member. Father also asserts that the domestic violence described by Julian did not endanger the three younger children. A parent's abuse of a child endangers that child but also endangers other children the parent may have in his care. *See In re E.C.R.*, 402 S.W.3d 239, 248 (Tex. 2013). When determining if children are at risk for abuse or neglect by their parent, the parent's treatment of other children must be considered: "Part of [the risk] calculus includes the harm suffered or the danger faced by other children under the parent's care." *Id*. The fact finder may consider evidence of Father's pattern of criminal activity, including parent-on-parent physical abuse. *See In re V.V.*, 349 S.W.3d at 556. ("A parent's criminal history—taking into account the nature of the crimes, the duration of incarceration, and whether a pattern of escalating, repeated

convictions exists—can support a finding of endangerment.").

Considered in the light most favorable to the trial court's finding, the evidence is legally sufficient to support the trial court's determination that termination of Father's parental rights was justified under Family Code section 161.001(b)(1)(E). Further, in view of the entire record, we conclude the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that termination was warranted under section 161.001(b)(1)(E). Accordingly, we conclude the evidence is legally and factually sufficient to support the subsection E finding.

Having concluded the evidence is legally and factually sufficient to support the trial court's finding under subsection E, we need not review the sufficiency of the evidence to support the subsections D and N findings. *See In re A.V.*, 113 S.W.3d at 362. We overrule Father's first, second, and fourth issues on appeal.

### III. Predicate Ground of Failure to Support

In Father's third issue he challenges the legal and factual sufficiency of the evidence to support the trial court's finding that he failed to support the children under subsection F. Although the supreme court does not require this court to address Father's remaining issues, the Department concedes in its brief that the evidence is legally insufficient to support the trial court's finding that Father "failed to support the child in accordance with the parent's ability during a period of one year ending within six months of the date of the filing of the petition[.]" Tex. Fam. Code § 161.001(b)(1)(F).

The trial court may not order termination under subsection F without clear and convincing evidence of the parent's ability to support the children during the statutory period. *In re D.M.D.*, 363 S.W.3d 916, 920 (Tex. App.—Houston [14th

Dist.] 2012, no pet.). The Department filed its pleading seeking termination of parental rights on March 26, 2019. The statutory period began no earlier than September 26, 2017. The party seeking to terminate, in this case the Department, has the burden to establish that the parent had the ability to support the child during each month in the 12-month period. *In re J.G.S.*, 574 S.W.3d 101, 117 (Tex. App.— Houston [1st Dist.] 2019, pet. denied). Without evidence of an ability to support the children during the 12-month statutory period, termination of parental rights cannot be granted under Subsection F. *Id*. The Department concedes that the record does not contain evidence showing Father had the ability to support the children during the statutory period. Likewise, our independent review of the record reveals no such evidence. We therefore sustain Father's third issue.

## CONCLUSION

Having sustained Father's third issue, we modify the trial court's final order to delete the finding pursuant to section 161.001(b)(1)(F). Having overruled Mother's issues on appeal and Father's issues challenging the sufficiency of the evidence to support the endangerment finding, we affirm the trial court's final order as modified.

/s/     Jerry Zimmerer
        Justice

Panel consists of Justices Wise, Zimmerer, and Wilson.